We welcome you to the Ninth Circuit today. As the good clerk has already informed you, Honorable Bybee has had a death in his family, and therefore he is attending with that. Our appreciate this opportunity to tell him that, and we appreciate him. On the other hand, today Honorable Bybee and I are very, very happy to welcome Judge Mendoza, who is a judge on the United States District Court for the Eastern District of Washington. He was appointed by President Obama, received his commission in 2014, and he's here to help us today. And I'm really happy he's here, especially happy since Judge Bybee's not here. I could be sitting in this seat relaxing, and instead I'm here. So it's really fun to have him come and be with me. So we will proceed in the normal manner. You need not worry that Judge Bybee is not here, because you know that we are recording every bit of this. And so what happens in these emergency situations like this, we take the transcript and recording, and Judge Bybee watches it in his chambers, and then after he's through watching it, then we conference and decide what we're going to do in these several cases. So we are full well ready for emergencies like this, and that's how we proceed in those kind of situations. Now, what will happen this morning? Well, we'll take up this hearing. I don't know how many of you have been here before to advocate in front of us, but I'll tell you a little bit about how it goes, since I remember when I was in your chair, and I wondered what in the devil was going to happen. When you come up to the podium, the green light will come on as you begin. It will keep going, and you, it looks to me like you have 15 minutes each one. The yellow light will come on as a warning that your time is going to expire. So when that comes on, you need to worry just a little bit about the time will expire. When the red light comes on, then your time is done. Now it's a little bit, and it's a little bit unnerving because the clock continues to run, and you may not notice it, but I, and I didn't when I was arguing, but then it starts running back up. So all of a sudden you think you got more time, but in fact you don't. Your time is over, and you're working in overtime now. So when you see the red light come on, then you should do as best you can to sum up, and I will not cut anybody off. If Judge Mendoza is in the middle of conversation with you, or I am, then you'll get extra time, but if in fact we're not in the middle of the conversation, then of course you need to quit. We're going to hear the cases as they're presented on the calendar, and when you come up, we hope you'll state your name and who you represent, and we'll let you go on and do what you need to do in argument for these particular cases. So we have submitted two cases on the calendar this morning. We've submitted case 18-15-630, Henry Thomas Spielbauer, and we've submitted 18-15-762, Tanisha Marie Tatum versus DeVita Health Care Partners et al. So we will submit those cases at this point as they are already submitted. We gave notice we would be submitting without argument. So with that, we will begin with case 15-709-02, Rosa Haiti Hernandez Romero versus the Attorney General. So, Counselor, if you'd come forward, we're prepared. Good morning, Your Honors, and may it please the Court. My name is Elizabeth F. Rodriguez, appearing on behalf of Rosa All right. Watch the clock yourself, because I won't remind you about that two minutes. And if Judge Mendoza or I are in the middle of our conversation, of course, we'll keep going. But so you've got to watch that for yourself. Okay. Thank you. But I appreciate you wanting to reserve it. Okay. Thank you. As to the first and second issue, I would like to start with today. It is important and relevant to this purpose of TPS designation. TPS designation is for persons who are not able to avail themselves to political asylum, but would nonetheless be in danger if they are removed to their home country. But doesn't that really relate, that TPS really relates to the issue about whether she was here for the seven years of admission or whether the cancellation of removal should be allowed? I would say that it does for that same reason. I mean, it seems to me those are really, that really relates to those, because we're considering whether Nicara is really something cancellation of removal is precluded from, and we're deciding whether she met the seven years of admission, right? Yes. Those are the last two issues, as I understood it, your assertions. Yes. But if we talk at the first assertion on admitting the evidence, because she was not informed of her right to counsel, did you want to address that? Yes, Your Honor, I could. Because if I read 8 CFR 287.3, which is the regulation about that, and I read some Iowa, and I'm from Idaho, so that may not be exactly the way you say that, versus Holder, you've got to have both without a warrant and placed in formal proceedings. And in this particular matter, petitioner was not in formal proceedings, correct? That is correct, Your Honor, but Samoya v. Martinez is distinguishable, because it began not at the port of entry, but while Samoya, and I'm pronouncing that badly as well, Samoya was already in the United States, and further, it was... But it doesn't, really, it doesn't have anything to do with that. The underlying charge wasn't relevant. The location of the arrest wasn't relevant. What was relevant was, it had to meet both without a warrant and placed in formal proceedings. Right, Your Honor, but also in that case, it was military police. Well, I know, but it wasn't limited to an interrogation by military police. It wasn't limited to interrogation, but... It just so happened that it was an interrogation. But in fact, what we said there, and what they say under the regulation is, petitioner was not in formal proceedings. And therefore, we don't have any reason to suggest, then, that your client should be informed. Well, we would say that that finding would be an error, because... Well, I know you'd say it would be an error, but what authority do you have for that? Well, in looking at the statute, Your Honor, and the plain reading of it... So it's got to be without warrant and placed in formal proceedings. And at that point, they would be advised of the reasons for the arrest and the right to be represented. It doesn't talk about or, it says and. Yes, Your Honor, but I would note that if looking at the statute logically, it would not make sense for the statute to only protect or... Are you saying it's a statutory interpretation question? I would say that, in part, it is. And if it's a statutory interpretation question, don't I owe some deference to the BIA? Not if... Well, if the statute is clear and unambiguous, and I can read it very carefully, then I don't. But otherwise, if it's ambiguous, which is the only way you can make that argument, I have to give them deference, don't I? Yes, Your Honor, so then I would say that it is ambiguous, just in looking at... But if it's ambiguous, then I give them deference, and they have got a regulation right on point that says it's got to be both. Yes, Your Honor, but I would move the court to look at why the statute, the congressional intent... Why? I don't think the why is all that important as it is. If I find it to be a clear and unambiguous statute, then I can read it, and I don't have to worry about it. I read it. I frankly think it's clear and unambiguous, and you need both. But even if I... So therefore, if I get to your argument, I've got to say it's ambiguous. And then I get the BIA, and then I have to say, well, goodness, I have to give those people deference in an ambiguous statute. Yes, Your Honor, but... But what? In looking at what the statute is supposed to be protecting, it wouldn't make sense that an officer would not have to give that type of rights or reading of rights to a person until after they already have gotten all the information that they can use against the petitioner. But just a minute. If, in fact, we have two situations where that can apply without a warrant or placed in formal proceedings, then at that point, we've done what we need to do, because these people are certainly not entitled to all the rights that are allowed to all citizens in the United States. I would say that in this case, Your Honor, we are dealing with a person who is a legal permanent resident. So I would say that she would be afforded more rights than somebody who is plainly not... If that's so, how do I distinguish matter of ERMG? Because the BIA directly addressed that argument. I would plainly look at what the statute is protecting, Your Honor. And again, I would look to the fact that there is nothing to protect if we have to... If the officer is not going to give any type of reading of rights until after everything, all the investigation is completed, then the statute would be useless to somebody who is in removal proceedings. Okay. Counsel, there's a related argument that I'm interested. I thought you were parsing that out in the briefing. This due process argument that I understand as it relates to the statute, but are you making a larger argument that due process in general applies, sort of a form of immigration, Miranda, applies in this context? Is that what you're arguing? And if so, could you elaborate on that? I would say that in part it does, especially when a person is detained, like the petitioner was here in secondary inspection, and she was not clearly allowed to leave. And she was placed in a position where the officers were questioning her and clearly trying to get information that could be used against her. But why should that apply? Why should these sort of prophylactic rules apply in this context? In this specific context, I would again go back to the fact that we're not just plainly dealing with somebody who is not a U.S. citizen, but to somebody who is a, who was, or I'm sorry, is a legal permanent resident. So I think... Do you think that's part of the egregious exception? I think it would be part of the egregious exception. Why didn't you exhaust that then? I would say that we did include that in our argument. Well, I looked through and I didn't find it. I didn't find it exhausted, therefore waived before the BIA. In my reading, Your Honor, I would say that we did include that. Where did the BIA address it? I don't think the BIA even addressed it. Maybe you can come up and give it to us in your two-minute rebuttal. Okay, thank you. Okay, do you want to move on? Yes, Your Honor, please. So a petitioner here was granted TPS status after meeting a rigorous eligibility requirements and was allowed to stay in the U.S. pursuant to that status. We note that in order to meet such requirements, she submitted herself to inspection by an immigration officer. And our argument is that such inspection constituted an admission, which would therefore mean that by the time immigration proceedings were initiated against her in 2006, she had resided in the U.S. continuously for well over the seven-year period. So you're arguing that the BIA erred in denying the cancellation of removal? Yes, Your Honor. Why shouldn't I send that back to the BIA to determine if it in fact is so? You know that Ramirez v. Brown, that's why we sent out our little questionnaire to you, said be prepared to talk about that. Ramirez v. Brown came out after the BIA had determined this case. Ramirez v. Brown seems to be what the argument you're making. They had no ability to really talk about that. Why shouldn't I just send that back and let them think about it rather than make a ruling now? They had no time to think about it. They didn't have the benefit of the Ramirez decision. And therefore, they ought to be able to give it another shot. They could, Your Honor. But as submitted in our brief, there also is the argument that the specific TPS designation grants a TPS status. So I think Well, but the reason you make that argument is because of Ramirez. Well, also in the TPS statute, it states that when a person is granted TPS status, excuse me, they are not in unlawful presence. They are in unlawful presence for purposes of the time in which they are granted TPS. I can understand your argument, but I can understand also that the first time we really said something about it was in Ramirez, and that was done after the BIA got through in this case. So I say to myself, why not let the BIA think about that? I think that also adds to your second argument, doesn't it? Whether NACARO is really one of those, if you will, statutes where cancellation of removal is precluded, they could take that up then, too, right? I guess they could, Your Honor. Well, I just didn't know. It seemed to me that this was some, you had at least a probability. But if you have to say, I mean, it's hard for me to determine whether they have the seven years. It's got as much fact in it as it is any other thing as to whether they have the seven years. That's if you win on TPS. Yes. Well, on another note under that same issue, I would also say that even if the court were to rule against Petitioner in finding that a TPS status is an admission, Petitioner is also eligible for cancellation of removal under prior recessions. The court there found that a notice... That's according to your letter you just submitted? Yes, Your Honor. But again, that seems to me to be something that the BIA could think about, since we're really talking about the TPS, whether Ramirez has anything to do with it. No question. These last decisions that you want us to give thought to came after the BIA had made this decision. Well, Your Honor, then I would say that it's important to give some sort of guidance for uniformity. More guidance than the Supreme Court. Well, I would say for uniformity as far as for whether TPS is considered an admission. Okay. And it seems my time is up. I would like to reserve the last two minutes. You'd like to reserve? You have another question or two? I don't. All right. My good help up here doesn't have one. We'll turn it over to the government. Mr. Bates. Good morning, Your Honors. Christopher Bates for the respondent, William Barr. I'd like to start briefly by noting on the question of the advisals and when the advisals must be given to an individual who is in custody. Your Honor is correct that this issue is governed by the Samayoa-Martinez case. There, this court held that notification of procedure rights are not required until the formal commencement of removal proceedings. The court further held in Samayoa-Martinez that formal proceedings don't begin until a notice to appear is filed with the court, with the immigration court. Counsel, that goes towards sort of the regulatory argument. But one of the arguments, although I don't know if she fleshed it out during oral, I understood her argument as well being that there are these due process rights that are constitutional rights that have nothing necessarily to do with the regulation that may in fact apply in this context. I'm not, again, I'm not sure the record necessarily reflects the full argument that could be made there. But don't you think that there could be this argument made about Miranda warnings availing themselves based upon due process principles? So this court has held that the exclusionary rule, and I understand that we're talking about Miranda, so there's a little, it's perhaps a little bit different in terms of Fourth versus Fifth Amendment. But this court has held that the exclusionary rule generally does not apply in immigration proceedings and has carved out two exceptions. The first is if there's an instance of a, quote, egregious constitutional violation. The second is that if there's been a violation of an agency regulation that was promulgated for the benefit of Petitioners and there was a violation of regulation such that there was prejudice for the Petitioners' protected interests. So, and on the, on that first prong, the egregious constitutional violation. So, again, those cases have been primarily in the Fourth Amendment-type context. But this court has been clear in the Martinez-Medina case, which we cited in our brief that conduct that, quote, shocks the conscience constitutes an egregious violation. And there's another case we cited in our brief, Gonzalez-Rivera, which found that racially discriminatory conduct by officers can constitute an egregious constitutional violation. Counsel, I'm a district court judge in my day job, and I have thrown out confessions when attorneys have not been allowed. Doesn't it shock the conscience that someone who would be facing this kind of peril would say, this shocks the conscience? Don't you think that that would be egregious enough? So, I know, Your Honor, that due process protections are different in the immigration context versus the criminal context. This issue has not, as you recognize, been fully briefed in this case. So I don't have on hand sort of all of the case citations to give, Your Honor, in terms of the differences of due process protections versus immigration context versus criminal context. So I think that there is certainly a difference there. And if the Court is interested in fleshing out this argument, we could definitely submit supplemental briefing on this issue. But I would say for this time that I do know that due process protections are different in the immigration context than in the criminal context. And as I understand it, this was never exhausted at the BIA level, correct? That's correct, Your Honor. If I may, Your Honors, I'd like to turn to the Petitioner's eligibility for cancellation of removal. I know this Court had asked us to be prepared to discuss some developments on this issue. Ramirez. Yes, Your Honor. So the first point that I would like to make and to emphasize for this Court is that the immigration judge and the BIA affirming the immigration judge found that the Petitioner was ineligible on two separate independent bases. The first was lack of seven years of continuous physical presence. The second was that the Petitioner had previously received special rule cancellation under NACARA. Under NACARA. And the Board found that both of those were independent bars to eligibility for cancellation. If I may just discuss the NACARA ground briefly, Your Honors. Well, did you want to say anything about the Ramirez ground? So I was going to come back to that, Your Honor, but I can start with that if you would like. Well, all I want to make sure of, it seems to me that if there is really something to be said about TPS, the TPS recipient having been inspected and admitted, that really Ramirez is his best argument, her best argument as to that. And given that that came out after this case was already decided, it seems to me that we ought to send that back and let them think about Ramirez a little bit. Would you disagree? So the government would say, Your Honor, that while the Board could certainly consider the application of Ramirez here, that Ramirez does not control this situation here. And in fact, although in a slightly different context, in the matter of Sosa Ventura decision, which we cited in our briefs, let me just turn to my notes. Well, but Ramirez suggests, doesn't it, that someone, a TPS status recipient is considered inspected and admitted when determining the recipient's eligibility for adjustment of status. And so if, in fact, that's the holding of Ramirez, it seems to me an argument could be made by this petitioner that it then controls her case. Certainly that argument could be made, Your Honor. And therefore, it seems to me the Board ought to think about that. That could be the case, Your Honor. I can offer some reasons for the Court why Ramirez is distinguishable and would highlight in particular the fact that Ramirez was about the interplay between the TPS statute and the adjustment of status statute and that there are, in fact, separate provisions in the TPS statute that govern the interplay between TPS and adjustment and TPS and cancellation. There's actually a separate provision in the TPS statute. This is subsection E of the TPS statute. The BIA has never really said this. This is your best argument, correct? That's correct, Your Honor. And therefore, it seems to me it would be logical for the BIA to have a chance at it. They may agree with you, but they may not. And otherwise, I've got to make their law for them, and that's something I guess I'm not supposed to do. Yes, Your Honor. I would note for your information, again, this is a slightly different context, but in the matter of Sosa Ventura decision of the Board, the Board there held that a remains removable under the INA, this is INA 212, is, quote, an alien who is present in the United States without being admitted or paroled. So although that's a slightly, they weren't addressing that specific, this specific instance here in the Sosa Ventura case, they did say that the bar on admissibility that's based on entry without admittance applies to individuals who don't have, or who have received TPS. And by extension here, if that were extended here, then that would mean that there were no admission here. And you saw the letter that we got from the petitioner. How would you respond to that? Because that's taking the opposite approach, isn't it? That's saying there's never even a, there's never, she's never ever been given a chance to even think about this. So certainly Pereira held that a notice to appear that doesn't include the time, date, and place doesn't trigger the stop time rule. And this Court subsequently in Lopez held that a subsequent notice of hearing that doesn't trigger the stop time rule. The government has petitioned for a hearing on Bonk in the Lopez case. I believe that the response is due in that case at the end of the month. So it may, it may yet be the case that this Court reverses its position in the Lopez decision. But certainly, certainly as the law currently stands, that is correct, Your Honor. And that's, I think, goes back to why it's relevant here that there were two grounds on which the Board found that the petitioner was ineligible, seven years. And that's correct, Your Honor. I hear your Nicara argument. So the petitioner received special rule cancellation under Nicara. This is, happened in April of 2006. And the cancellation statute, this is subsection C6 of the cancellation statute, precludes cancellation of removal, quote, for an alien whose removal has previously been canceled under this section. And if you look at Nicara, this is section 203B of Nicara. I'm going to quote from Nicara. It says, quote, the Attorney General may, under section 240A, so that's the cancellation statute, the Attorney General may, under section 240A, cancel removal of and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien applies and meets certain conditions set forth in Nicara. And so Nicara itself expressly says that a special rule cancellation under Nicara constitutes cancellation under section 240A, and I would also note that Nicara specifies that the annual numerical cap on cancellations of removal under 240A does not apply to Nicara either. And there would be no reason for Nicara to specify that the annual numerical cap in the cancellation statute doesn't apply unless cancellation under Nicara was cancellation under the cancellation statute. Congress really wanted Nicara to be, those who got Nicara status to be precluded from cancellation removal, they very easily could have amended the statute to say directly, no Nicara. They could have, Your Honor, that's true. But they didn't. That's true. They instead provided for that in the text of Nicara itself. Oh, I don't know whether that, I guess if we accept your interpretation thereof, they did. That's correct, Your Honor. From the clearer plain text of Nicara, which says that when the Attorney General cancels removal and adjusts status under Nicara, the Attorney General does it under section 240A. Well, but you agree with me that Congress enacted 203, which is Nicara, after the enactment of 1229B. And in other words, I've got to say that 1229B.C.6 clearly suggests that these recipients were meant to be excluded from applying. If I can't find that in that language, then they're not excluded, correct? That's correct, Your Honor. But we would say that the Nicara... What if that is, I find that not clear, but instead ambiguous? So... Do I owe the DIA some deferences to that? So my understanding, Your Honor, is that this Court does not provide deference to unpublished decisions of the Board. The decision... Well, then probably I ought to send it back to give them a chance to think about that, shouldn't I? So we would say, Your Honor, that Nicara is clear that it is cancellation under 248, but if you disagree, then that could be an appropriate question for the Board to address in the first instance. I agree with you. I don't think the BIA provided me sufficient explanation in this decision to say I've made my decision about that. So I'm just pressing you a little further. If it's clear, then I guess that you've won the argument. If it's not clear, then it seems to me that I ought to remind the issue to the BIA so they can give me some help. That could be an appropriate question. Therefore, based on these two different prongs, plus the prong that came up in the letter that we just barely got, it seems to me it would be a good decision to send this back to the BIA and think about Ramirez, think about this last stuff that we have still going on in another courtroom of our Court, plus we ought to think about Nicara. So we would argue, Your Honor, again, that the text of Nicara is clear and that Ramirez need not be extended here, but certainly if this Court views Nicara as not clear or views the Ramirez question as one that could be more helpfully addressed by the Board, then that would be something that the Court could consider. Thank you. I appreciate your straightforward approach here. Thank you, Your Honor. Thank you very much for answering my questions directly. Sometime counsel stand on both feet and give an answer which doesn't quite address it, and I'm thankful you didn't do that. No, I'm thankful, Your Honor. There are, of course, a couple other issues that are at play in this case. I would note just briefly on the question of whether the Petitioner knowingly aided or abetting in the bringing of an individual into this country that the Altamirano case on which Petitioner relies, I would note that in that case the Petitioner was not the driver but was merely the passenger in the vehicle. So that case is clearly distinguishable from the case here where the Petitioner was. Was the driver presented a birth certificate that she knew did not match the young boy's name or the mother of the young boy's name to the immigration official, misrepresented her relationship to the young boy to the immigration official. And so the conduct that the Petitioner engaged in here as related to actions aiding or abetting the bringing of an individual to this country were much stronger and much more direct than they were in the Altamirano case. And this Court has no further questions. Then we would ask this Court to deny the Petitioner's petition for review. I have no further questions, and my good colleague has none. We appreciate that. You have two, I don't know exactly how much, but some rebuttal time. Counselor. Okay, as to the question about whether it does shock the conscience in the sense that respondent here was subject to being, I would say that it does shock the conscience that there was no counsel present because she was subject to removal and being stripped of LPR status. Before you get to that, though, counsel puts it right in perspective. That's why I ask you the question. You got two ways to get around that under our precedent. One is an egregious exception, and the other is one that doesn't apply. And if it's an egregious exception, which it seems to me is the one you're trying to do, that was never exhausted before the BIA. So how do I get it in front of me? Well, Your Honor, actually, if I can move on to the, I really want to look into. You don't want to answer that question? You want to give me another answer? But you do concede that it wasn't exhausted. Oh, well, as I stated earlier, I would say that, I mean, I believe that it was exhausted, but I understand the Board's position on that matter. Okay. As to the second case of NACARA, I would note that the purpose of NACARA is different for both NACARA and cancellation of removal. Under NACARA, the purpose of NACARA, as stated in Simeon v. Ashcroft, is that the purpose is to grant procedural relief to qualified aliens, allowing them to begin anew their stop-time rule. So I would just reiterate that, like the Board stated, it was not included prior to the IIRA, and the purpose of that was to give them a less stringent standard than the one required by cancellation of removal post-IIRA. Thank you. Thank you. We appreciate your argument, Counselor. Thank you. Appreciate both arguments. Appreciate you being here, both of you, and the way that you have addressed these issues is very refreshing. So the case 1570902 is now submitted.
judges: Bybee, N.R. Smith, Mendoza Jr.